**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JASUBHAI K. DESAI,

        Petitioner,

v.                                     CIVIL CASE NO. 05-74243
                                     HON. MARIANNE O. BATTANI

RAYMOND BOOKER,

        Respondent.

_____/

**OPINION AND ORDER CONDITIONALLY GRANTING**
**PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS**

## I.    INTRODUCTION

Before the Court is Jasubhai K. Desai's ("Petitioner") petition for writ of habeas corpus (Doc. #1). Petitioner is a state inmate currently incarcerated at the Ryan Correctional Facility in Detroit, Michigan. Through counsel, he filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights. Petitioner challenges his state conviction and sentence for first-degree premeditated murder, stemming from the 1983 death of Anna Marie Turetzky. Petitioner was charged with her murder in 1995. He was sentenced to mandatory non-parolable life imprisonment.

In his petition, Petitioner asserts that the Michigan Court of Appeals' decision was either contrary to, or an unreasonable application of, clearly established federal law for the following reasons: (1) by affirming the trial court's decision admitting the alleged hearsay confession of Stephen Adams, a co-defendant in the case, which implicated Petitioner in the murder of Anna

Marie Turetzky, Petitioner's Sixth Amendment right to confront witnesses against him was violated; (2) by affirming the trial court's decision excluding the exculpatory preliminary examination testimony of deceased witness, Oscar Trendov, Petitioner was denied the opportunity to present a defense as guaranteed by the Sixth and Fourteenth Amendments; and (3) by affirming Petitioner's conviction, despite the prosecution's eighteen-year delay between the alleged crime and the start of Petitioner's trial, Petitioner was deprived of due process of law.

For the reasons set forth below, the Court **CONDITIONALLY GRANTS** Petitioner's petition for writ of habeas corpus based on his Confrontation Clause claim.[1]

## II.     STATEMENT OF FACTS

This case arises out of the homicide of Anna Marie Turetzky ("Ms. Turetzky").  On November 7, 1983, Woodhaven Police Officer James Osborn found her body in the front seat of a car parked in a hotel parking lot.  The medical examiner determined that she had been strangled, manually, approximately four days prior to the discovery of her body.

Twelve years after the discovery of Ms. Turetzky's body, the Wayne County Prosecutor charged Stephen Adams ("Adams"), a former employee of the Petitioner, and Petitioner, Ms. Turetzky's business partner, with her murder.  The case came to trial in September 2001, approximately eighteen years after the murder.

Petitioner, a physician from India, emigrated to the United States where he practiced medicine in Trenton, Michigan.  During the 1970's, Petitioner and Ms. Turetzky worked together; he as a doctor, and she as a nurse.  In 1976, Petitioner and Ms. Turetzky decided to

_____

[1] The Court will only discuss the facts relevant to the resolution of the claim on which Petitioner is being granted habeas relief.

form a partnership to build their own walk-in clinic. They did so in Trenton, Michigan. Ms. Turetzky handled the public relations, recruited new patients, and managed the office, and handled the clinic's finances. Petitioner provided medical services to the patients. Co-defendant Adams worked for Petitioner and Ms. Turetzky.

In 1979, Petitioner and Ms. Turetzky entered into a stock redemption agreement whereby they agreed to sell their stock in the clinic to their corporation upon either's death. Petitioner and Ms. Turetzky, acting on the advice of an insurance agent and a lawyer, in 1981, formed a separate partnership and created a separate corporation for the clinic. They also purchased insurance policies on each, naming the clinic as the beneficiary. The purpose of the policies was to not only compensate the clinic for the loss of the services of a deceased partner, but also to provide the clinic with money in the event of either death so that if they, or their heirs, decided to sell their interest in the corporation and/or partnership, they would have the necessary funds. The policies provided for $200,000 insurance on Ms. Turetzky's life and $300,000 insurance on Petitioner's life.

Although the relationship between Petitioner and Ms. Turetzky was strained at times, their partnership was lucrative. Despite the strained relationship, and in addition to operating the Trenton clinic, in 1982, Petitioner and Ms. Turetzky opened another clinic in Monroe, Michigan. In order to limit the friction between them, Ms. Turetzky and Petitioner agreed that Petitioner would work out of the Monroe clinic, and Ms. Turetzky would work out of the Trenton clinic.

Leilani Jeanne Sigman, a former employee who worked at the Trenton clinic from 1978 to 1981, testified at trial that she witnessed arguments between Petitioner and Ms. Turetzky. She testified that during her tenure at the Trenton clinic, she heard Petitioner and Ms. Turetzky argue

over billing practices, with Ms. Turetzky not wanting to charge for services that Petitioner provided to his patients. Ms. Sigman also witnessed what she described as some violent episodes between the two; she saw Ms. Turetzky slap Petitioner and she saw Petitioner grab Ms. Turetzky's arms. She testified that there were several times that she also saw Ms. Turetzky with bruises on her forearms and abrasions on her chin. Likewise, she saw Petitioner with scratches on his neck and with a bloody nose.

In 1983, a dissolution of the arrangement was advised, because of the alleged strain between Petitioner and Ms. Turetzky. However, that did not occur. Rather, Petitioner and Ms. Turetzky entered into an agreement, whereby the Monroe clinic would pay Ms. Turetzky an annual salary of $40,000, and Petitioner an annual salary of $325,000, each with a remaining interest in the assets of their partnership; Ms. Turetzky was to receive forty percent of the remaining profits from the Monroe clinic, and Petitioner was to receive sixty percent. They also agreed, at the recommendation of their insurance agent, to increase the value of their insurance to $1.25 million dollars ($500,000 for the partnership and $750,000 for the corporation), with the clinic remaining the beneficiary.

On September 29, 1983, Petitioner and Ms. Turetzky entered into yet another agreement in which Petitioner agreed that he would repay his portion of the money, borrowed by the partnership, which was used to establish the Monroe clinic. Ms. Turetzky agreed that, once Petitioner repaid her, she would have no interest in the Monroe clinic. That month, the clinic issued two checks to Ms. Turetzky's personal services corporation totaling $30,000.

Ms. Turetzky was last seen alive on November 3, 1983. She left the clinic early that day, stating she was going to a court appointment. Four days later, on November 7, 1983,

Woodhaven Police Officer Osborn discovered her body in the front seat of her car, which was parked in the parking lot of a Best Western Motel in Woodhaven, Michigan. There was testimony that another officer had noticed the car parked there for two days, but he never bothered to look inside the vehicle. After discovering Ms. Turetzky's body, Officer Osborn called for assistance. Lieutenant David Hesburn and his partner, Sergeant James Johnson, were next to arrive at the scene.

The officers found Ms. Turetzky's body lying on the front passenger seat of her car with her head toward the steering wheel. Her hands were crossed over her chest. The coat she wore was bunched up under her arms and its belt was underneath her body. Lieutenant Hesburn saw scratches or gouges underneath her eyes, marks under her chin and on the back of her hand, bruising on her neck, and dried blood on her mouth. Smeared blood was on the left lapel of her coat and blood was on the sleeve. Two hairs were found on her clothing. Testing demonstrated that the blood and hair found were consistent with that of Ms. Turetzky's.

Ms. Turetzky was wearing two necklaces and a gold ring with six diamonds. Her purse was on the center console of the car; some of its contents had been strewn on the floor. No money was found in her purse. The keys were in the ignition, but were partially removed so that the door ajar bell did not ring when the door was opened. Lieutenant Hesburn testified that he attempted to photograph the scene, but those photographs did not turn out because he did not set his camera properly for the lighting conditions. Lieutenant Hesburn did not generate a detailed sketch of the crime scene. The officers did not place Ms. Turetzky's hands in plastic bags to preserve skin or hair samples, did not interview the motel patrons, and did not properly preserve

the papers scattered in Ms. Turetzky's car. No significant evidence was preserved from the scene.

The county medical examiner performed an autopsy and concluded that Ms. Turetzky had been manually strangled to death. He concluded that she had been killed about eighteen hours to two days before the discovery of her body.

The Woodhaven police turned Ms. Turetzky's car over to the Michigan State Police for processing. Fingerprints lifted from the car did not match Ms. Turetzky's, Petitioner's, or Co-defendant Adams's. After the Michigan State Police Crime Lab completed its examination of Ms. Turetzky's car, it was released to the family.

Subsequently, the family contacted the police and told them that they had found a tissue in the car on which the initials "S.A." - allegedly the initials of Stephen Adams - had been written in lipstick or eyeliner. The police lost that tissue.

The investigation by the police languished without sufficient evidence to press charges against anyone. As a result, the Turetzky family advertised a substantial offer of reward money to anyone who had any information about the murder.

Shortly after the murder of his mother, Ms. Turetzky's son, John, confronted Petitioner at the Monroe clinic. He demanded that Petitioner tell him why he had killed his mother, and proceeded to pull a gun on him, firing two shots. Petitioner was not injured. However, during the confrontation, Petitioner denied having anything to do with his Ms. Turetzky's murder.

Several months after the murder, Richard Lobdell and Mike Baron, two friends of the Turetzky family, lured Adams to the Melody Inn Motel in Woodhaven, Michigan, and attempted to coerce him into confessing to the murder. Despite the coercive efforts of Lobdell and Baron,

Adams denied any involvement in the murder. Both Lobdell and Baron testified that they taped their interrogation of Adams and gave it to the police. The police lost the tape.

After the motel incident with Adams, it was Lobdell's testimony that he directed the police to Adams's car, which was abandoned as a result of his fleeing from the motel. In the car, the police found "The Anarchist Cookbook;" a book detailing how to wreak havoc and cause harm. In that book, a paragraph concerning how to strangle a person was underlined. The police testified that they found it unusual that such a book, with that particular underlining, would fall into their hands more than six months after the murder. However, the police lost the book.

It was also Lobdell's testimony that he taped conversations with Petitioner in which he tried unsuccessfully to get Petitioner to confess to the murder. Lobdell said that he delivered those tapes to the police. The police lost those tapes.

After months of investigation, the Wayne County Prosecutor's Office concluded that it did not have enough evidence to charge Petitioner and/or Adams in the Turetzky murder. One fact that weighed heavily against charging Petitioner and Adams was that Adams passed a polygraph examination during which he denied any involvement in the murder.

Even though the police and the prosecutor had ample reason to continue their investigation, there were substantial periods during which the investigation was inactive and/or during which time the police and the prosecutor did not use the resources available to conduct the investigation. For instance, in January 1985, a federal prosecutor wrote to the Wayne County Prosecutor advising that (1) a federal grand jury investigation had uncovered evidence concerning Ms. Turetzky's murder and (2) the federal prosecutor would seek an order disclosing the transcript of the relevant grand jury testimony at the close of the federal investigation.

However, the present record contains no evidence that the Wayne County Prosecutor made any effort to follow up on that matter until July 1988.

Also in 1988, the Wayne County Prosecutor's Office learned that a witness named Larry Gorski claimed that Adams had confessed that he had murdered Ms. Turetzky approximately six weeks after Turetzky's murder. The alleged confession took place in two stalls in a men's room of a noisy bar. However, the Wayne County Prosecutor's office did not investigate this claim until six years later.

Finally, in 1995, the Wayne County Prosecutor decided to charge Petitioner and Adams, after concluding that a favorable change in the law would allow the admission of Gorski's hearsay account of Adams's alleged confession against Petitioner. People v. Poole, 506 N.W.2d 505 (Mich. 1993) (holding that the portions of a suspect's confession inculpating his alleged accomplice may be admitted against the accomplice under the statement against penal interest exception to the hearsay rule codified in MICH. R. EVID. 804(b)(3)). The prosecution's theory at trial was that Petitioner hired Adams to kill Ms. Turetzky so that he could have sole ownership of their businesses. Petitioner argued that Ms. Turetzky was either killed during a robbery or by one of the many people who had a motive to harm her.

After the prosecution filed charges against Petitioner in 1995, Petitioner moved to dismiss those charges on the ground that he had suffered enormous prejudice as a result of the charging delay: the death of key witnesses, the loss of critical evidence, faded memories. The trial judge at that time, Judge Karen Fort Hood, granted the motion, finding that the prosecution had intentionally delayed the investigation in order to gain a tactical advantage. That court also found that Petitioner had demonstrated actual prejudice as a result of the charging delay.

Respondent appealed that decision to the Michigan Court of Appeals, which, in 1998, reversed and remanded for trial. The Michigan Court of Appeals found that the delay was for investigatory rather than tactical purposes. The Michigan Court of Appeals held that Petitioner did not establish prejudice as a result of the delay, despite the fact that witnesses had died and evidence had been lost. <u>People v. Desai</u>, 591 N.W.2d 44 (Mich. Ct. App. 1998). Subsequently, an application for leave to appeal was filed with the Michigan Supreme Court. The application was denied. <u>People v. Desai</u>, 603 N.W.2d 783 (Mich. 1999) (Cavanagh and Kelly, JJ., would have granted leave to appeal).

After the Michigan Court of Appeals remanded the case for trial, Petitioner filed a supplemental motion to dismiss, elaborating upon the prejudice that he suffered as a result of the delay in charging. The state trial court denied the motion.

Jury selection began on September 10, 2001, and continued on the morning of September 11, 2001, at the time that the country experienced the terrible terrorist attack on the World Trade Center and the Pentagon. The trial was adjourned for that day, but continued on the morning of September 12, 2001. Petitioner moved to adjourn the trial on the ground that he could not receive a fair trial in the emotionally-charged atmosphere following the attacks because of his heritage. The state trial court denied that motion, but agreed to give Petitioner leeway to explore, during *voir dire*, issues related to the jurors' attitudes following the attacks.

Petitioner and Adams were tried jointly, with separate juries. There were times during the trial that the juries were separated, and the Adams jury heard witness testimony that Petitioner's jury did not hear. The prosecution's theory of the case was that Petitioner had Ms. Turetzky killed so that, through the use of the insurance proceeds, he could obtain her share of

their business at no cost. The only direct evidence against Petitioner was Adams's alleged men's room confession to Gorski. And, because Adams invoked his Fifth Amendment right not to testify, Petitioner was unable to counter Gorski's account of Adams's alleged confession with Adams's testimony.

At trial, Gorski testified to knowing Adams, and admitted that he and Adams had in the past committed some crimes together. Gorski claimed that about six weeks after the Turetzky murder, he was at a bar listening to a friend's band when Adams arrived and asked to meet him in the men's bathroom. Gorski testified that he and Adams met in the men's bathroom, and went into adjoining stalls, with the doors closed. It was Gorski's testimony that Adams, who is hearing impaired and wears a hearing device, spoke to him through the tiny crack between the stall divider and the wall. He said that Adams admitted to him that he strangled Ms. Turetzky to death with his hands and a necktie. Gorski said that Adams told him that Petitioner was involved and paid him to kill her.

According to Gorski's testimony, Adams may have been drinking at the time that he had allegedly confessed to him about the murder. Gorski also acknowledged that he had seen Adams use cocaine before and he could not determine whether or not he was under the influence of the drug at the time of the bathroom meeting. It was well-known at the time that Adams was a drug addict and that he had a criminal history, including forging prescriptions.

Initially, the police focused on Gorski as a possible suspect in the Turetzky murder, thus giving Gorski an incentive to implicate Adams in the Turetzky murder. Because of his prior association with Adams, Gorski was aware that the clinic did a substantial cash business, and he had previously tried to steal cash from Petitioner as he was leaving the clinic one day.

The jury deliberated for four days before convicting Petitioner of first-degree murder on October 16, 2001. The jury, hearing the same evidence against Adams as the Petitioner's jury, was unable to reach a verdict. Following the hung jury in Adams's case, the prosecution dismissed all charges against Adams relating to Ms. Turetzky's murder, and did not re-try him. The murder charges against Adams were dismissed in return for his plea of *nolo contendere* to a charge of solicitation to do great bodily harm, a charge completely unrelated to the Turetzky murder. After his plea, Adams received a sentence of ten months in the county jail, with work release.

On November 2, 2001, Judge Worthy sentenced Petitioner to non-parolable life imprisonment. Petitioner filed his claim of appeal to the Michigan Court of Appeals within the appropriate time, alleging the following issues:

I. Whether defendant's Sixth Amendment right to confront the witnesses against him was violated when the trial court admitted a hearsay confession of his co-defendant, Stephen Adams, that implicated defendant.

II. Whether defendant was denied his right to present a defense by the trial court's exclusion of "exculpatory" preliminary examination testimony from an unavailable witness.

III. Whether the Due Process Clause barred the trial of defendant for Turetzky's murder given the long delay between the murder and the filing of charges which prejudiced defendant's rights, including that the police lost critical evidence.

IV. Whether the trial court erred in refusing to at least give a requested adverse inference instruction regarding the loss of relevant evidence.

V. Whether the trial court lacked jurisdiction to adjudicate the matter because under the statute in effect at the relevant time the court did not have jurisdiction to reverse the trial court's initial decision and remand the matter.

VI. Whether reversal of defendant's conviction is required because of the cumulative effect of the trial court's errors.

On November 6, 2003, the Michigan Court of Appeals affirmed Petitioner's conviction. People v. Desai, No. 238210, 2003 WL 22515292 (Mich. Ct. App. Nov. 6, 2003). Petitioner filed an application for leave to appeal to the Michigan Supreme Court raising the same issues. The application was denied on August 31, 2004. People v. Desai, 685 N.W.2d 669 (Mich. 2004).

Petitioner did not file a petition for a writ of certiorari in the United States Supreme Court, nor did he file a motion for relief from judgment pursuant to sub-chapter 6.500 of the Michigan Court Rules. Petitioner's petition is timely in that it was filed less than one-year following the date on which Petitioner's conviction became final by virtue of the expiration of the period for him to file a petition for a writ of certiorari in the United States Supreme Court–ninety days (90). 28 U.S.C. § 2244(d)(1)(A). Petitioner has not filed any previous petitions in this or any other federal district court.

Petitioner filed the pending petition for writ of habeas corpus on November 4, 2005, challenging his conviction on the following grounds:

I.      The decision of the Michigan Court of Appeals affirming the admission of Adams's alleged hearsay confession which implicated Petitioner was contrary to and was an unreasonable application of clearly established federal law concerning a criminal defendant's Sixth Amendment right to confront the witnesses against him.

II.     The decision of the Michigan Court of Appeals affirming the exclusion of the exculpatory preliminary examination testimony of deceased witness Oscar Trendov was an unreasonable application of clearly established federal law concerning a criminal defendant's right to present a defense.

III.    The decision of the state appellate court to allow this case to proceed to trial and later to affirm the conviction where the prosecution strategically delayed indictment which delay severely prejudiced Petitioner's ability to mount a defense was an unreasonable application of clearly established federal law concerning due process protections against pre-indictment

delays and was based on unreasonable determinations of fact under 28 U.S.C. § 2254 (D)(2).

IV.     Assuming *arguendo* that the standard of review set forth in 28 U.S.C. § 2254 (D)(1) precludes relief in this action the Court should not apply that standard because it is unconstitutional and the Court should grant the writ under a *de novo* standard of review.

## III.    STANDARD OF REVIEW

Petitioner's application was filed after April 24, 1996, therefore, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (April 24, 1996). See Lindh v. Murphy, 521 U.S. 320, 326-27 (1997). Specifically, the AEDPA states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d).

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal court may grant habeas relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or, (2) if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." Id.

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts.  Williams, 529 U.S. at 407-08.  Relief is also available under this clause if the state-court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context.  Id. at 407; Arnett v. Jackson, 393 F.3d 681, 686 (6th Cir. 2005).  The proper inquiry for the "unreasonable

application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect.  Williams, 529 U.S. at 407; Lordi v. Ishee, 384 F.3d 189, 195 (6th Cir. 2004).

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  Williams, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting Williams, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state-court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require awareness of

[Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). Although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. See Dickens v. Jones, 203 F.Supp. 354, 359 (E.D. Mich. 2002).

## IV.    ANALYSIS

Petitioner contends his conviction must be reversed on the ground that the trial court allowed Gorski to testify as to Adams's alleged confession. According to Petitioner, the admission of out-of-court statements by Petitioner's nontestifying co-defendant abridged his Sixth Amendment right to confront the witnesses against him. Petitioner argues that Adams's alleged confession to Gorski did not fall within a firmly rooted exception to the hearsay rule,[2] and thus, under clearly established federal law, the state courts were required to exclude the confession if either (1) cross-examination of Adams would have had more than marginal utility for Petitioner or (2) Adams's alleged confession was not reliable under the totality of the circumstances. Idaho v. Wright, 497 U.S. 805, 818 (1990).

The Sixth Amendment's Confrontation Clause provides, in relevant part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This guarantee applies to both federal and state prosecutions. Pointer v. Texas, 380 U.S. 400, 406 (1965). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by

---

[2]The prosecution offered the alleged confession as a statement against Adams's penal interest under MICH. R. EVID. 804(6)(3), the analog to Fed. R. Evid. 804(b)(3).

15

subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990). When the government seeks to offer a declarant's out-of-court statements against the accused, and, as in this case, the declarant is unavailable, courts must decide whether the Clause permits the government to deny the accused his usual right to force the declarant "to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth.'" California v. Green, 399 U.S. 149, 158 (1970) (footnote and citation omitted).

At the time of Petitioner's trial and direct appeal, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in Ohio v. Roberts, 448 U.S. 56 (1980).

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

Id., at 66.

The Wayne County Circuit Court held that the admission of Adams's alleged confession was constitutional, primarily because, in its view, it was against Adams's penal interest, and statements against the penal interest of an unavailable witness fall within a firmly rooted exception to the hearsay rule in Michigan. MICH. R. EVID. 804(6)(3). This Court assumes, as it must, that Adams's statements were against his penal interest as a matter of state law, but whether the statements fall within a firmly rooted hearsay exception for Confrontation Clause purposes is a question of federal law. Therefore, the Court must determine whether the Michigan Court of Appeals' decision affirming the admission of Adams's alleged hearsay

confession was contrary to, and was an unreasonable application of, clearly established federal

law concerning a criminal defendant's Sixth Amendment right to confront the witnesses against

him. To do so, the Court must determine whether the hearsay testimony bears adequate indicia

of reliability. Adequate indicia of reliability can be shown by either establishing that the

evidence falls within a firmly rooted hearsay exception, or if not, by establishing that there are

particularized guarantees of trustworthiness that would make the hearsay testimony otherwise

admissible.

A.    **Firmly Rooted Hearsay Exception**

The United States Supreme Court has allowed the admission of statements falling within

a firmly rooted hearsay exception because the Framers of the Sixth Amendment intended to

respect certain unquestionable rules of evidence in drafting the Confrontation Clause. Mattox v.

United States, 156 U.S. 237, 243 (1895). Justice Brown reasoned that an unduly strict and

"technical" reading of the Clause would have the effect of excluding other hearsay evidence,

such as dying declarations, whose admissibility neither the Framers nor anyone else two-hundred

years later "would have [had] the hardihood . . . to question." Id.

Reliability of hearsay statements is inferred if the evidence was admitted pursuant to a

firmly rooted hearsay exception. The theory behind this presumption is that these firmly rooted

exceptions represent judgments, based on history and practice, that statements made in certain

circumstances are inherently trustworthy such that the "adversarial testing [embodied in the

Confrontation Clause] would add little to [its] reliability." Wright, 497 U.S. at 821. Thus, a

hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of

virtually any evidence within [the exception] comports with the substance of constitutional protection." Roberts, 448 U.S. at 66 (internal quotation omitted).

Rule 804 of the Federal Rules of Evidence sets forth certain exceptions to the hearsay rule that apply when the declarant is an unavailable witness. Specifically, Rule 804(b)(3) states:

> (b)  Hearsay exceptions.  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (3)  Statement against interest**.**  A statement  which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.  A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

FED. R. EVID. 804(b)(3).  Here, neither party challenges the trial court's determination that Adams was in fact an unavailable witness.  However, it is Petitioner's position that Gorski's testimony does not fall within the hearsay exception specified.

The Sixth Circuit has held that the hearsay exception for statements against penal interest constitutes a firmly rooted exception for purposes of Confrontation Clause analysis.  Gilliam v. Mitchell, 179 F.3d 990, 994 (6th Cir. 1999); Neuman v. Rivers, 125 F.3d 315, 319-20 (6th Cir. 1997).  The "against penal interest" exception is founded on the broad assumption "that a person is unlikely to fabricate a statement against his own interest at the time it is made."  Chambers v. Mississippi, 410 U.S. 284, 299 (1973).  In criminal trials, statements against penal interest are offered into evidence in three principal situations: (1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) as evidence offered by the prosecution to

establish the guilt of an alleged accomplice of the declarant.  <u>Lilly v. Virginia</u>, 527 U.S. 116, 127

(1999).  In <u>Lilly</u>, the Supreme Court considered these three categories and their roots separately.

>Statements in the first category – voluntary admissions of the declarant – are routinely offered into evidence against the maker of the statement and carry a distinguished heritage confirming their admissibility when so used. . . . .

>The second category of statements against penal interest encompasses those offered as exculpatory evidence by a defendant who claims that it was the maker of the statement, rather than he, who committed (or was involved in) the crime in question. . . . .

>The third category includes cases, like the one before us today, in which the government seeks to introduce "a confession by an accomplice which incriminates a criminal defendant." . . . .

>Most important, this third category of hearsay encompasses statements that are inherently unreliable.  Typical of the groundswell of scholarly and judicial criticism that culminated in the *Chambers* decision, Wigmore's treatise still expressly distinguishes accomplices' confessions that inculpate themselves and the accused as beyond a proper understanding of the against-penal-interest exception because an accomplice often has a considerable interest in "confessing and betraying his cocriminals." . . . .  Consistent with this scholarship and the assumption that underlies the analysis in our *Bruton* line of cases, we have over the years "spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants."

<u>Lilly</u>, 527 U.S. at 127-131 (citations omitted).

Notwithstanding the general admissibility of statements against penal interest,

"accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted

exception to the hearsay rule as that concept has been defined in our Confrontation Clause

jurisprudence."  <u>Id</u>., at 134.  Moreover, "statements by a nontestifying codefendant that implicate

the accused are presumptively unreliable and thus in violation of the Confrontation Clause."

U.S. v. Gibson, 409 F.3d 325, 337 (6th Cir. 2005) (citing Bruton, 391 U.S. at 126.).  The

Supreme Court has stated that a co-defendant's statement, although a statement against his penal

interest, "posed such a serious threat to [the petitioner's] right to confront and cross-examine the

witnesses against him that he was entitled to a new trial."  Bruton v. U.S., 391 U.S. 123, 138

(1968).  Even Justice White in his dissent noted, "nothing in that confession which was relevant

and material to Bruton's case was admissible against Bruton."  Id.

Since the Supreme Court's ruling in Bruton, the Court has consistently either stated or

assumed that the mere fact that one accomplice's confession qualified as a statement against his

penal interest did not justify its use as evidence against another person.  Gray v. Maryland, 523

U.S. 185, 194-95 (1998) (Scalia, J., dissenting) (stating that co-defendant's confessions "may not

be considered for the purpose of determining [the defendant's] guilt"); Richardson v. Marsh, 481

U.S. 200, 206 (1987) ("[W]here two defendants are tried jointly, the pretrial confession of one

cannot be admitted against the other unless the confessing defendant takes the stand").

As far back as 1909, the Supreme Court stated that even when an alleged accomplice

testifies, his confession that "incriminate[s] himself together with defendant . . . ought to be

received with suspicion, and with the very greatest care and caution, and ought not to be passed

upon by the jury under the same rules governing other and apparently credible witnesses."

Crawford v. United States, 212 U.S. 183, 204 (1909).  And, in Douglas v. Alabama, 380 U.S.

415 (1965), the Court held that the admission of a nontestifying accomplice's confession, which

shifted responsibility and implicated the defendant as the triggerman, "plainly denied [the

defendant] the right of cross-examination secured by the Confrontation Clause."  Id., at 419.

In light of the long line of Supreme Court precedents discussed above, the state court's admission of Adams's alleged confession because it fell within a firmly rooted exception to the hearsay rule was contrary to, and an unreasonable application of, clearly established federal law concerning a criminal defendant's Sixth Amendment right to confront the witnesses against him.

## B.        Particularized Guarantees of Trustworthiness

Notwithstanding the fact that Adams's alleged confession does not fall within a firmly rooted hearsay exception, it may still be admissible against Petitioner.  Where a nontestimonial statement[3] is at issue, the Confrontation Clause "operates in two ways to restrict the range of admissible hearsay."  Id., at 814.  First, the prosecution "must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant."  Id. Second, if a witness is shown to be unavailable, his statement is admissible "only if it bears adequate indicia of reliability."  Id., at 815-16.  "'Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness."  Id., at 815 (quoting Roberts, 448 U.S. at 66).

As shown above, Gorski's testimony does not fall within a firmly rooted hearsay exception.  However, "the presumption of unreliability that attaches to codefendants' confessions may be rebutted."  Lilly, 527 U.S. at 137.  The unreliability of such statements are *per se* rebutted if that statement is "made during the course and in furtherance of the conspiracy .

---

[3] It is clear that Adams's alleged statements to Gorski were not "testimonial" under any of the three formulations recognized in Crawford.  See U.S. v. Franklin, 415 F.3d 537, 545-46 (6th Cir. 2005) (statements to acquaintances are nontestimonial under Crawford v. Washington). Respondent concedes that Adams's alleged confession is nontestimonial in nature.  Resp't Resp. Br., at 18.

. . ." Id.  Adams's alleged restroom confession to Gorski was not made during the course and in furtherance of the conspiracy.  "Thus, unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement."  Wright, 497 U.S. at 821.  Therefore, for the statement to be admissible, "'particularized guarantees of trustworthiness' must be shown from the totality of the circumstances . . . . that surround the making of the statement and that render the declarant particularly worthy of belief. "  Id., at 819.

Particularized guarantees of trustworthiness exist "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility . . . ."  Id., at 820.  In other words, if cross-examination would be of marginal utility, "then the hearsay rule does not bar admission of the statement at trial."  Id.  Likewise, a statement is not barred if " the totality of circumstances that surround the making of the statement . . . render the declarant particularly worthy of belief."  Id.

Where cross-examination of the declarant would be of more than marginal utility, the hearsay statement is not sufficiently trustworthy that it may be admitted without violating the defendant's Sixth Amendment rights.  Id., at 823.  The state appellate court failed to consider whether cross-examination of Adams would have had more than marginal utility for Petitioner's defense.  Failure to do so resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.

However, this Court finds that the record contains substantial evidence that on cross-examination, Adams would have contradicted the hearsay account of his alleged confession.

Adams repeatedly denied having any involvement in Ms. Turetzky's murder – even when admitting involvement would have meant dismissal of the charges against him and even when under physical duress at the Melody Inn Motel. In addition, Adams passed a polygraph examination in which he denied killing Ms. Turetzky. See People v. Adams, 591 N.W.2d 44 (Mich. Ct. App. 1998).

Further, on cross-examination Adams could have been asked about his profound hearing loss. That testimony would have undermined Gorski's description of Adams's alleged confession. At a pretrial hearing, Adams testified that since the age of six he suffered from serious hearing loss in both ears and that he reads lips in order to compensate. Adams's Pretrial, Tr. pp. 54-66, 6/1/01. That hearing loss was so severe that he received a medical discharge from the military. Id. Against that backdrop, Adams's testimony would have undercut Gorski's claim that Adams confessed while they were in separate stalls in the bathroom of a loud bar while a band was playing. Moreover, through cross-examination, Petitioner could well have established Adams's history of lying and committing crimes of dishonesty. Petitioner could have also further developed evidence of Adams's alleged prior involvement in a conspiracy to assault Petitioner.

Such cross-examination would certainly have had "more than marginal utility" to Petitioner. To the contrary, it would have gone to the heart of the prosecution's most important piece of evidence. Because cross-examination of Adams would have had enormous utility for Petitioner, the statement is inadmissible under Lilly. Because the Michigan Court of Appeals did not consider those factors, its decision affirming the admission of Adams's alleged confession to Gorski, was contrary to, and was an unreasonable application of, clearly established federal law.

Moreover, the totality of circumstances that surround the making of the statement do not render the declarant particularly worthy of belief. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." Wright, 497 U.S. at 822; U.S. v. Price, 134 F.3d 340, 348 (6th Cir. 1998). In assessing the trustworthiness of Adams's alleged confession, Supreme Court precedent required the state appellate court to carefully consider the "totality of the circumstances" surrounding the alleged confession and to consider whether Adams was particularly worthy of belief. Wright, 497 U.S. at 818. Here, by ignoring the factors that rendered Adams an unreliable declarant, and by ignoring the many factors that showed the unreliability of Adams's alleged confession, the Michigan Court of Appeals failed to apply clearly established federal law.

At the time of Adams's alleged men's room confession, he was not someone who was particularly worthy of belief. He had a long criminal record, including crimes of dishonesty. Trial Tr., pp. 6-7, Oct. 2, 2001. In fact, the prosecution itself tried to discredit testimony given by Adams at a pretrial hearing in this case by demonstrating that he had many contacts with the police from 1976 to 1988, for various crimes, including fleeing and eluding, breaking and entering, and possession of marijuana and unlawful syringes. Testimony also revealed that Adams was a known drug abuser and may well have been using drugs and alcohol at the time of his alleged confession. That fact alone sharply undercuts Adams's reliability as a declarant because individuals suffering from drug addictions are known to lie and manipulate. See U.S. v. McDonald, 688 F.2d 224, 233 (4th Cir. 1982) (declarant's regular drug use made her an

"inherently unreliable witness"); <u>U.S. v. Bobo</u>, 994 F.2d 524, 528 (8th Cir. 1993) (declarant not reliable because he had been convicted of cocaine felony and later failed a drug test).

Gorski's testimony also revealed that, although Adams's alleged confession was self-inculpatory, many statements were not self-inculpatory and implicated Petitioner. Although Adams allegedly admitted to doing the actual killing, he implicated Petitioner as the initiator and leader of the alleged murder conspiracy,[4] shifting the blame to Petitioner. Thus, Adams's alleged claim that Petitioner was the ringleader of the Turetzky murder scheme shifted to Petitioner the lion's share of the blame, and vitiates the reliability of Adams's alleged statements.

Even if Adams's alleged statements did not shift blame to Petitioner, they nevertheless undeniably spread blame to Petitioner, and such blame-spreading statements are no more reliable than blame-shifting statements. "It is clear that our cases consistently have viewed an accomplice's statements that shift *or spread* the blame to a criminal defendant as falling outside the realm of those 'hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability.'" <u>Lilly</u>, 527 U.S. at 134 (citation omitted) (emphasis added). <u>See also</u> <u>U.S. v. Pineda</u>, 208 F.Supp. 2d 619 (E.D. Va. 2001) (under Supreme Court authority, there is no distinction between statements that shift blame and statements that spread blame). "A reasonable person in [Adams's] position might even think that implicating someone else would decrease his practical exposure to criminal liability . . . ." <u>Williamson v. U.S.</u>, 512 U.S. 594, 604 (1994). The fact that Adams's statement shifted or spread the blame to

---

[4] Leaders of criminal activity are regarded as more culpable than those who carry out the plan. <u>See</u> United States Sentencing Guidelines, Sec. 3B1.1 (enhancement for leadership/ organization role in multiple offender situation).

Petitioner renders the statement inadmissible against Petitioner. Id., at 605 ("that the very fact that a statement is genuinely self-inculpatory - which our reading of Rule 804(b)(3) requires - is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause.").

Nevertheless, the Michigan Court of Appeals found that Adams's alleged statements did not shift the blame to Petitioner. People v. Desai, 2003 WL 22515292, at *4 (Mich. Ct. App. 2003). The Court finds that the state appellate court's finding was a decision that was based on an unreasonable determination of the facts in light of the testimony presented.

Moreover, the fact that Adams allegedly incriminated himself does not make his accusation of Petitioner any more credible. As the Supreme Court explained, "[o]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." Lilly, 527 U.S. at 133 (citations omitted). Simply stated, "accomplice testimony has always come to the courtroom blemished," and thus the fact that Adams incriminated himself as well as Petitioner does not make his statements any more trustworthy. U.S. v. Chapin, 231 F.Supp. 2d 600, 608 (E.D. Mich. 2002).

In failing to analyze the case by looking at the totality of the circumstances, the Michigan Court of Appeals also failed to take into account the location of Adams's purported confession. The location of the purported confession is also a circumstance that cuts against reliability; the men's restroom of a noisy and crowded bar is not a setting that induces truthfulness. See, e.g., Wright, 497 U.S. 820-21 (explaining the reasoning behind the "dying declaration" and "medical treatment" hearsay exceptions). Statements made in a noisy bar's bathroom are not statements "given under circumstances that eliminate the possibility of fabrication, coaching, or

confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous." Id. The relevant circumstances that surround the making of the statement do not render the declarant particularly worthy of belief, and thus, the admission of such a statement was contrary to clearly established federal law. Id., at 819.

The Court therefore finds that Gorski's hearsay evidence regarding Adams's admission that Petitioner hired him to murder Turetzky was admitted improperly by the trial court, as that evidence clearly implicates Petitioner, and thus, violated Petitioner's right to confront the witnesses against him because the statement was presumptively inadmissible and does not bear adequate indicia of reliability. As a result, the Court concludes that the state appellate court's decision affirming the trial court's decision was contrary to, and an unreasonable application of, federal law. Petitioner is therefore entitled to habeas relief on this claim.

### C.     Petitioner Is In Custody In Violation of His Constitutional Rights As Interpreted By the Supreme Court Today

The Supreme Court, in Crawford v. Washington, held that the Confrontation Clause bars the admission of testimonial statements made by witnesses out of court unless the declarant is unavailable and the accused has had a previous opportunity to cross-examine the witness. Crawford, 541 U.S. 36, 53-54 (2004). See also U.S. v. Cromer, 389 F.3d 662, 671 (6th Cir. 2004). This bright-line rule abrogated, in part, the prior rule of Roberts, that the admission of hearsay did not violate the Confrontation Clause if the declarant was unavailable and the statement fell under a "firmly rooted hearsay exception or otherwise bore particular indicia of reliability." Crawford, 541 U.S. at 59. Respondent contends that Crawford undermined the application of the Roberts test to nontestimonial statements, and thus, allows the admission of

nontestimonial statements by unavailable co-defendants.  Respondent argues that even if the

Court of Appeals violated clearly established federal law by allowing Gorski to testify as to

Adams's alleged confession, Desai's habeas claim must fail because Adams's alleged confession

would be admissible under current federal law.

Respondent's argument is based on the premise that 28 U.S.C. § 2254 requires a

petitioner to show both that the state court unreasonably applied Supreme Court law as it existed

at the time of the state court decision, and that his constitutional rights, as presently conceived,

were violated.  Even if Respondent's reading of § 2254 were correct, Desai's constitutional

rights as presently conceived were violated.  Crawford v. Washington left the Roberts rule

untouched with respect to nontestimonial statements, and Roberts's reliability analysis continues

to apply to the admission of nontestimonial hearsay.  "Where nontestimonial hearsay is at issue,

it is wholly consistent with the Framers' design to afford the States flexibility in their

development of hearsay law – as does *Roberts*, and as would an approach that exempted all such

statements from Confrontation Clause scrutiny altogether."  Crawford, 541 U.S. at 68.

> As the courts applying the rule in that case have observed,

> The lynchpin of the *Crawford* decision thus is its distinction between testimonial
> and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies
> only to the former category of statements . . . .  [U]nless a particular hearsay
> statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still
> controls.

U.S. v. Hendricks, 395 F.3d 173, 179 (3d Cir. 2005).  Likewise, the Second Circuit has held,

> [d]espite the criticisms that *Crawford* and the *White* concurrence aim at existing
> Confrontation Clause jurisprudence, *Crawford* leaves the *Roberts* approach
> untouched with respect to nontestimonial statements. The *Crawford* Court
> expressly declined to overrule *White*, in which the majority of the Court
> considered and rejected a conception of the Confrontation Clause that would

restrict the admission of testimonial statements but place no constitutional limits on the admission of out-of-court nontestimonial statements. . . . .

U.S. v. Saget, 377 F.3d 223, 227 (2d Cir. 2004).  See also U.S. v. Holmes, 406 F.3d 337, 348 n14 (5th Cir. 2005) (holding that a majority of the Court in Crawford declined to overrule White insofar as it would place no constitutional limits on the admissibility of nontestimonial statements, and instead left the admissibility of nontestimonial statements to controlling hearsay law).

Most importantly, the Sixth Circuit has also held that Crawford "did not disturb the rule that nontestimonial statements are constitutionally admissible if they bear independent guarantees of trustworthiness."  U.S. v. Gibson, 409 F.3d 325, 337-38 (6th Cir. 2005).  In other words, "the admission of statements by a nontestifying codefendant that implicate the accused are presumptively unreliable and thus in violation of the Confrontation Clause" unless "they bear independent guarantees of trustworthiness" under the Roberts' framework.  Id.

Because Adams's alleged confession was nontestimonial in nature, and the Court's decision in Crawford left untouched the standards used to determine the admissibility of nontestimonial statements, Petitioner's constitutional rights, as presently conceived, have been violated.

For the stated reasons, the Court concludes that Petitioner is entitled to federal habeas relief on his claim regarding the Confrontation Clause.  Because the Court has concluded that Petitioner is entitled to habeas relief on this claim, the Court considers it unnecessary to review Petitioner's remaining claims and declines to do so.  See Haynes v. Burke, 115 F. Supp. 2d 813, 819-20 (E.D. Mich. 2000); Berrier v. Egeler, 428 F. Supp. 750, 754 (E.D. Mich. 1976).

## V. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Petitioner's Application for Writ of

Habeas Corpus is **CONDITIONALLY GRANTED.** Unless the State takes action to afford

Petitioner a new trial within ninety (90) days of the date of this Order, he may apply for a writ

ordering Respondent to release him from custody.

**IT IS SO ORDERED.**


s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE



DATED: May 8, 2007




### CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail

and/or electronic filing.


s/Bernadette M. Thebolt
DEPUTY CLERK